FILED
2026 Jul-29  PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **EMILY JACKSON**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**AESTO, LLC d/b/a AESTO HEALTH**,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Emily Jackson ("Plaintiff"), through undersigned counsel, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Aesto, LLC d/b/a Aesto Health ("Aesto" or the "Company"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Aesto's failure to properly secure and safeguard highly sensitive protected health information and personally identifiable information (collectively, "Private Information") that Plaintiff and a class of individuals entrusted to it.

2. Aesto is a Birmingham, Alabama healthcare-technology company that provides healthcare data migration and archiving services and acts as a business associate to healthcare providers throughout the United States ("Covered Entities"). Aesto holds itself out as an industry authority on securely archiving and accessing healthcare data. It is HITRUST R2 certified and SOC 2 Type II audited, supports more than 70,000 users, has completed over 5,500 migrations,

1

and works with more than 200 source IT systems. Aesto was founded in 2018 through the merger of ChartCapture and GeauxTech.

3.    To provide its data migration and archiving services, Aesto received, stored, and maintained the Private Information of patients of its Covered Entity clients, including Plaintiff and the Class.

4.    On or about December 18, 2025, Aesto experienced a network security incident that impacted a limited portion of its Amazon Web Services ("AWS") infrastructure (the "Data Breach"). Aesto later determined that between on or about December 2, 2025, and December 18, 2025, an unauthorized actor may have accessed and/or acquired protected health information belonging to patients of various Covered Entity clients stored within Aesto's network.

5.    The compromised Private Information included full names, dates of birth, medical information, driver's license numbers, financial account numbers, health insurance information, individual taxpayer identification numbers, other government identification numbers, and Social Security numbers. The elements of information varied per individual, and Social Security numbers were potentially involved for a limited number of individuals.

6.    Aesto did not confirm the scope of the Data Breach until May 26, 2026—following an extensive forensic investigation and manual document review—and did not begin notifying its Covered Entity clients until on or about June 26, 2026. The public Notice of Data Security Incident is dated June 24, 2026. This delay of approximately six months from the start of the Data Breach deprived victims of the earliest opportunity to protect themselves from identity theft and fraud.

7.    This was not Aesto's first data security incident. In 2022, Aesto suffered a prior cyberattack: the intrusion was detected on March 8, 2022; an unauthorized individual had access to Aesto's systems from December 25, 2021, to March 8, 2022; files were exfiltrated from a

backup storage device, including radiology reports containing names, dates of birth, physician names, and report findings from Osceola Medical Center in Wisconsin; and the breach was reported to HHS' Office for Civil Rights as affecting 17,400 patients. Because of this prior breach, Aesto had actual knowledge that its systems were a target for cybercriminals and that a breach of this kind could and would occur—making the December 2025 Data Breach all the more foreseeable and inexcusable. The 2025 Data Breach was exponentially worse than the 2022 incident: it exposed far more sensitive data elements, including Social Security numbers, financial account numbers, driver's license numbers, and individual taxpayer identification numbers, for patients across at least seventeen Covered Entities.

8.    Plaintiff brings this action to recover damages, to obtain restitution, and to compel Aesto to adopt reasonable data-security practices to prevent future harm.

**PARTIES**

9.    Plaintiff Emily Jackson is a natural person and citizen of Vandalia, Illinois, where she intends to remain. Plaintiff's Private Information was provided to a Covered Entity and, in turn, entrusted to Aesto in connection with Aesto's data migration and archiving services. Plaintiff is a victim of the Data Breach.

10.    Defendant Aesto, LLC d/b/a Aesto Health is a foreign limited liability company with its principal place of business at 1800 International Park Drive, Suite 110, Birmingham, Alabama 35243. Upon information and belief, at least one of Defendant's limited liability company members are Alabama corporations, entities, or citizens.

11.    Aesto provides healthcare data migration and archiving services to healthcare providers throughout the United States.

3

**JURISDICTION AND VENUE**

12.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed Class; and at least one Class Member is a citizen of a state different from Aesto, establishing minimal diversity.

13.     This Court has personal jurisdiction over Aesto because Aesto's principal place of business and headquarters are located in this District, and Aesto conducts substantial business in this District.

14.     Venue is proper in this District under 28 U.S.C. § 1391 because Aesto resides in this District, its principal place of business and relevant data systems and cybersecurity and incident-response decisions are located in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**BACKGROUND**

*Aesto and Its Collection of Private Information*

15.     Aesto operates as a "business associate" as defined under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.103, handling protected health information ("PHI") on behalf of its Covered Entity clients pursuant to Business Associate Agreements ("BAAs"). Aesto's Privacy Notice, last updated March 2026, confirms that it "may process Protected Health Information (PHI) as part of the services it provides to its customers" and that "[s]uch information is processed solely on behalf of customers (Covered Entities) in accordance with applicable HIPAA requirements and Business Associate Agreements (BAAs)."

16.    By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and members of the Class, Aesto assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their Private Information from unauthorized access and disclosure.

17.    The Covered Entities whose patients' Private Information was compromised in the Data Breach include, as of July 28, 2026: Henry County Hospital; Midtown Community Health Center; Little River Memorial Hospital; Graham County Hospital; Missoula Community Health Services Inc., dba Mineral Community Hospital Monroe Health Center; Mid-South OB-GYN, PLLC; Women's Health Associates, Inc.; Together Women's Health Medical Group of Alabama, PC; Together Women's Health Medical Group, PC; Effingham Obstetrics & Gynecology Associates, PLLC; Main Street Medical Services, PLLC; Rural Health Resources of Jackson County Inc. d/b/a Holton Community Hospital; Park West Health Systems, Inc.; Marana Health; Greenwood County Hospital; Gila Health Resources, LLC; Edwards County Medical Center; Ellenville Regional Hospital; Shenandoah Valley Medical System Inc.; Texas Spine Consultants, LLP; and Nebraska Orthopedic Center, P.C.

18.    Plaintiff and the Class did not have direct control over how Aesto stored and maintained their Private Information. Rather, Plaintiff and the Class were at Aesto's mercy—Aesto had sole control and authority over the protection of their Private Information within its systems.

19.    Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Private Information and relied on Aesto to keep their Private Information confidential and securely maintained, to use it only for authorized business purposes, and to make only authorized disclosures of this information.

*Aesto's Security Representations*

20.    Aesto's publicly available Privacy Notice (last updated March 2026) represents that it employs "industry-standard technical and organizational measures to safeguard your personal information," including "[s]ecure data encryption," "[a]ccess controls and authentication measures," and "[r]egular security audits and compliance reviews." The Privacy Notice further states that data "is processed and stored within secure cloud environments, including infrastructure located in the United States."

21.    Aesto holds itself out publicly as HITRUST R2 certified and SOC 2 Type II audited. It promotes a "Trust Center" that provides access to its HITRUST certification, SOC 2 Type 2 attestation, incident response policies, business continuity and disaster recovery plans, data privacy practices, and AI governance policy, representing that "Aesto Health meets the security and compliance standards that healthcare organizations require."

22.    These representations were made to, and intended to be relied upon by, Aesto's Covered Entity clients and, by extension, the patients whose Private Information Aesto received and stored. One or more of these representations were not accurate when made. Despite these assurances, Aesto failed to implement commercially reasonable safeguards sufficient to protect Private Information from unauthorized access, as evidenced by the Data Breach.

*The Data Breach*

23.    On or about December 18, 2025, Aesto experienced a network security incident that impacted a limited portion of its Amazon Web Services infrastructure. Upon detecting the unauthorized activity, Aesto states that it "immediately contained the incident and commenced a thorough investigation" and "engaged leading cybersecurity experts to identify what personal information, if any, was involved."

6

24.     After an extensive forensic investigation and manual document review, on May 26, 2026, Aesto confirmed that between on or about December 2, 2025, and December 18, 2025, certain protected health information belonging to patients of various Covered Entity clients stored within Aesto's network "may have been accessed and/or acquired by an unauthorized actor."

25.     The Private Information compromised in the Data Breach included full names, dates of birth, medical information, driver's license numbers, financial account numbers, health insurance information, individual taxpayer identification numbers, other government identification numbers, and Social Security numbers. The elements of information varied per individual, and Social Security numbers were potentially involved for a limited number of individuals.

26.     Commencing on June 26, 2026, Aesto notified its Covered Entity clients whose patient information was included in the files potentially accessed or acquired by the unauthorized party. The public Notice of Data Security Incident is dated June 24, 2026. Aesto established a dedicated and confidential toll-free response line at 833-918-8060 with engagement number B167683.

27.     The root cause of the Data Breach, the specific vulnerabilities exploited by the unauthorized actor, the identity of the threat actor, and the specific remedial measures Aesto has undertaken to prevent a recurrence have not been fully disclosed to Plaintiff and the Class. This lack of transparency diminishes their ability to assess and mitigate the ongoing risks to their Private Information.

28.     The timeline reveals an unconscionable delay: the unauthorized access began on or about December 2, 2025; the incident was not detected until December 18, 2025—sixteen days later; the scope was not confirmed until May 26, 2026—over five months after detection; and notification to Covered Entity clients did not begin until June 26, 2026—over six months after the

7

intrusion began. Throughout this period, Plaintiff and the Class had no knowledge that their Private Information had been compromised and could not take steps to protect themselves.

***Aesto Knew, or Should Have Known, of the Risk of a Data Breach***

29.    This was not Aesto's first data security incident. In 2022, Aesto suffered a cyberattack that was detected on March 8, 2022. An investigation confirmed that an unauthorized individual had access to Aesto's systems from December 25, 2021 to March 8, 2022—a period of approximately 73 days. During that time, files were exfiltrated from a backup storage device, including radiology reports from Osceola Medical Center in Wisconsin containing patients' names, dates of birth, physician names, and report findings related to radiology imaging. The 2022 breach was reported to HHS' Office for Civil Rights as affecting 17,400 patients.

30.    The 2022 breach gave Aesto actual knowledge that its systems were targeted by cybercriminals and that a breach of this nature could and would occur. Despite this knowledge, Aesto failed to implement sufficient additional safeguards to prevent the far more devastating December 2025 Data Breach. The 2025 Data Breach was exponentially worse: it exposed far more sensitive data elements—including Social Security numbers, financial account numbers, driver's license numbers, and individual taxpayer identification numbers—for patients across at least seventeen Covered Entities, compared to the limited radiology-report data compromised in 2022.

31.    Data thieves and cybercriminals specifically target custodians of protected health information because it is among the most valuable categories of stolen data. Healthcare data is worth more on the dark web than financial data because it contains a comprehensive set of personal identifiers that can be used for a broader range of fraudulent purposes—from insurance fraud and prescription fraud to long-term identity theft—and because, unlike a credit card number, medical identifiers and Social Security numbers cannot simply be cancelled and reissued.

32.    Cyberattacks targeting the healthcare sector have increased dramatically in recent years. According to the U.S. Department of Health and Human Services, the number of large healthcare data breaches reported to the Office for Civil Rights has increased year over year. The healthcare industry is a prime target precisely because entities like Aesto store vast quantities of sensitive PHI on networked systems.

33.    Given the highly sensitive nature of the Private Information Aesto was entrusted to protect, the well-documented threat landscape targeting healthcare data custodians, and Aesto's own experience as a breach victim in 2022, the December 2025 Data Breach was entirely foreseeable and preventable.

*Aesto Failed to Comply with FTC Guidelines*

34.    Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the failure to use reasonable measures to protect personal information.

35.    The FTC has published numerous guides for businesses regarding the proper protection of personal information, including "Protecting Personal Information: A Guide for Business" (2016), which recommends that businesses: (a) know what personal information they have in their files and on their computers; (b) scale down information collection and retention; (c) lock personal information maintained in physical form; (d) protect information maintained electronically; (e) properly dispose of information that is no longer needed; and (f) have a plan to respond to security incidents.

36.    The FTC has further advised businesses to: implement access controls and authentication procedures; conduct regular security assessments; train employees on data security practices; monitor systems for unauthorized access; encrypt sensitive information in transit and at

9

rest; and maintain a comprehensive incident response plan that includes prompt notification of affected individuals.

37.    Aesto failed to comply with one or more of these FTC guidelines and best practices, thereby engaging in unfair practices in violation of Section 5 of the FTC Act. Such failure constitutes an unfair practice because: (a) the Data Breach caused or is likely to cause substantial injury to consumers; (b) the injury is not reasonably avoidable by consumers; and (c) the injury is not outweighed by countervailing benefits to consumers or competition.

***Aesto Failed to Comply with HIPAA and HITECH***

38.    As a business associate under HIPAA, 45 C.F.R. § 160.103, Aesto is directly subject to the HIPAA Security Rule, 45 C.F.R. §§ 164.302–164.318, and certain provisions of the HIPAA Privacy Rule, as extended by the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), 42 U.S.C. § 17931.

39.    The HIPAA Security Rule requires covered entities and their business associates to, among other things: (a) ensure the confidentiality, integrity, and availability of all electronic PHI ("ePHI") the entity creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of ePHI; (c) protect against any reasonably anticipated uses or disclosures of ePHI that are not permitted or required; (d) implement administrative, physical, and technical safeguards, including access controls, audit controls, integrity controls, and transmission security; and (e) ensure workforce compliance. 45 C.F.R. § 164.306.

40.    The HITECH Act's Breach Notification Rule, 45 C.F.R. § 164.410, requires a business associate that discovers a breach of unsecured PHI to notify each affected covered entity without unreasonable delay and in no case later than sixty (60) days after discovery. Upon

information and belief, Aesto failed to provide timely notice in compliance with this requirement, given that the scope was confirmed on May 26, 2026, and notification did not commence until June 26, 2026—and the individual notices from Covered Entities to affected patients came still later.

41.    Aesto failed to comply with its obligations under HIPAA and HITECH by, among other things: failing to implement adequate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of ePHI; failing to protect against reasonably anticipated threats to the security of ePHI; failing to prevent, detect, contain, and correct security violations in a timely manner; and failing to provide timely breach notification. These failures establish the standard of care and demonstrate that Aesto's conduct fell below the minimum level of data security required by law.

***Aesto Failed to Comply with Industry Standards***

42.    The Center for Internet Security's Critical Security Controls ("CIS Controls") represent a minimum standard of information security for all entities that collect and maintain personal information. The CIS Controls set forth eighteen prioritized security controls, including: inventory and control of enterprise assets; data protection; access control management; continuous vulnerability management; audit log management; email and web browser protections; malware defenses; data recovery; security awareness and skills training; and incident response management.

43.    The National Institute of Standards and Technology ("NIST") Cybersecurity Framework v2.0 provides a risk-based approach to managing cybersecurity risk and outlines five core functions: Identify, Protect, Detect, Respond, and Recover. The NIST Framework is widely recognized as an accepted standard of reasonable cybersecurity for organizations handling sensitive information.

11

44.     Upon information and belief, Aesto failed to meet the minimum standards set forth in the CIS Controls and the NIST Cybersecurity Framework, including by failing to: implement adequate data protection and access control measures; conduct continuous vulnerability management; maintain and review audit logs; implement adequate malware defenses; provide sufficient security awareness training; and maintain an effective incident response capability sufficient to detect intrusions promptly and minimize harm.

***Value of Private Information and the Dark Web***

45.     Private Information is a valuable commodity to identity thieves. The Private Information compromised in the Data Breach—particularly the combination of Social Security numbers, dates of birth, medical information, financial account numbers, and driver's license numbers—can be sold on the dark web and underground marketplaces for significant sums.

46.     On the dark web, stolen personal health information records sell for between $250 and $1,000 per record—far more than credit card numbers (which sell for $5 to $110) or Social Security numbers alone (which sell for $1 to $10). Complete identity packages known as "Fullz"— which contain a victim's name, Social Security number, date of birth, address, and financial account information—sell for $30 to $100 or more.

47.     The reason health records command such high prices is that they contain a comprehensive constellation of personal identifiers that enable a broader range of criminal activity. With medical information, cybercriminals can commit insurance fraud, obtain prescription drugs, file false claims, or create synthetic identities that are extremely difficult to detect. Unlike a credit card that can be cancelled immediately upon discovery of fraud, medical records, Social Security numbers, and dates of birth are permanent, they cannot be changed or reissued.

48.    Social Security numbers are especially damaging when compromised because they serve as a master key to an individual's financial identity. A stolen Social Security number can be used to open new credit accounts, file fraudulent tax returns, apply for government benefits, obtain employment under a false identity, and commit countless other forms of identity theft. Victims may not discover Social Security number misuse for months or years.

49.    Medical identity theft is particularly insidious because it often goes undetected for extended periods—an average of nearly two years, according to industry studies. Fraudulent entries in medical records can result in misdiagnosis, inappropriate treatment, or denial of insurance coverage and can take years to correct, if they can be corrected at all.

50.    Once Private Information is exposed in a data breach, it can be used, sold, and re-sold on the dark web indefinitely. There is no way to "un-compromise" stolen data. The threat of identity theft and fraud persists for the lifetime of the affected individuals.

51.    The Private Information compromised in the Data Breach has already been exposed to unauthorized actors and is now at significant risk of being used, disseminated, sold, and re-sold on the dark web and other underground forums, subjecting Plaintiff and Class Members to a lifetime of heightened risk of identity theft and fraud.

***Plaintiff Emily Jackson's Experience***

52.    Plaintiff Jackson entrusted her Private Information to a Covered Entity for the purpose of obtaining healthcare services. That Covered Entity, in turn, entrusted Plaintiff's Private Information to Aesto in connection with Aesto's data migration and archiving services.

53.    Plaintiff would not have entrusted her Private Information to the Covered Entity—and thereby to Aesto—absent an expectation that her Private Information would be protected from unauthorized access and disclosure.

54.     Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of her Private Information, including by limiting disclosure to trusted healthcare providers and their authorized agents.

55.     Since learning of the Data Breach, Plaintiff has spent and will continue to spend significant time and effort monitoring her financial accounts, credit reports, and medical records for signs of unauthorized activity.

56.     As a result of the Data Breach, Plaintiff has suffered anxiety, stress, fear, and emotional distress concerning the present and future security of her Private Information. Plaintiff has suffered a loss of the value of her Private Information and faces an imminent, immediate, and continuing increased risk of identity theft, fraud, and other harm.

57.     Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains in Aesto's possession or control—is adequately protected from further unauthorized access.

***Plaintiff's and Class Members' Injuries***

58.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including but not limited to: (a) An imminent, immediate, and continuing increased risk of identity theft and fraud that is traceable to the Data Breach; (b) Lost or diminished value of their Private Information, which had tangible value to identity thieves before it was compromised and has now been diminished; (c) Out-of-pocket costs associated with the prevention, detection, and mitigation of identity theft and fraud, including costs for credit monitoring services, credit freezes, credit reports, and related expenses; (d) Lost time and opportunity costs associated with addressing the fallout from the Data Breach, including time spent monitoring accounts, placing fraud alerts, communicating with financial institutions and

14

healthcare providers, and taking other preventive measures; (e) Loss of privacy resulting from the unauthorized exposure of their Private Information to unknown third parties;  (f) Emotional distress, including anxiety, fear, and loss of sleep, resulting from the knowledge that their most sensitive personal and health information has been compromised; (g) The continued and ongoing risk that Plaintiff's and Class Members' Private Information—which remains in Aesto's possession—will be subject to further unauthorized access due to Aesto's demonstrated inability to adequately protect it; (h) Loss of the benefit of the bargain, in that a portion of the fees paid for healthcare services were intended to cover the cost of adequate data security, which Aesto failed to provide; and (i) Future costs of credit monitoring and identity-theft protection services, which industry sources estimate at approximately $200 per year, for a minimum of five years and potentially for the lifetime of the affected individuals.

## CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action on behalf of herself and as a nationwide class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Class:

> *All individuals residing in the United States whose Private Information was compromised in the Data Breach affecting Aesto announced on or about June 24, 2026 (the "Class").*

60.    Excluded from the Class are: (a) Aesto, its subsidiaries, affiliates, officers, directors, employees, and agents; (b) all governmental entities; (c) the judge assigned to this action and the judge's staff and immediate family members; and (d) any individual who timely and validly opts out of the Class.

61.    Plaintiff reserves the right to amend or modify the Class definition with greater specificity or further division into subclasses as discovery and the further development of facts warrant.

15

62.    **Ascertainability.** The members of the Class are readily ascertainable from information and records in Aesto's possession, custody, or control, including the records used to provide notification of the Data Breach to its Covered Entity clients. The Class is ascertainable because it is defined using objective criteria.

63.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of individuals whose Private Information was compromised in the Data Breach. The precise number of Class Members is known to Aesto and may be ascertained through appropriate discovery.

64.    **Commonality and Predominance.** Common questions of law and fact exist as to all members of the Class and predominate over any individual questions. These common questions include, but are not limited to:

(a) Whether Aesto owed a duty to Plaintiff and Class Members to protect their Private Information and to provide timely and adequate notice of the Data Breach;

(b) Whether Aesto breached its duty to protect the Private Information of Plaintiff and Class Members by failing to implement and maintain reasonable security measures;

(c) Whether Aesto knew or should have known that its data security practices were inadequate to protect Plaintiff's and Class Members' Private Information from unauthorized access;

(d) Whether the Data Breach was foreseeable, particularly given Aesto's prior 2022 data breach;

(e) Whether Aesto's conduct constituted negligence;

(f) Whether Aesto breached implied contracts with Plaintiff and Class Members;

16

(g) Whether Aesto was unjustly enriched by failing to adequately invest in data security;

(h) Whether Aesto failed to comply with applicable laws, regulations, and industry standards, including HIPAA, HITECH, FTC Act Section 5, and the CIS Controls and NIST Cybersecurity Framework;

(i) Whether Plaintiff and Class Members suffered injury as a result of the Data Breach; and

(j) Whether Plaintiff and Class Members are entitled to damages, restitution, injunctive relief, and/or other equitable relief.

65. **Typicality.** Plaintiff's claims are typical of the claims of the Class in that Plaintiff and all Class Members were similarly injured by Aesto's wrongful conduct as described herein. Plaintiff's Private Information, like that of every other Class Member, was compromised as a result of the Data Breach. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class Members, and Plaintiff's claims are based on the same legal theories.

66. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel experienced in prosecuting complex class actions, including data breach litigation. Plaintiff's interests are not antagonistic to, and do not conflict with, the interests of the Class. Plaintiff and her counsel are committed to the vigorous prosecution of this action and have the financial resources to do so.

67. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation, making it impracticable for Class Members to obtain effective redress individually. Individualized litigation

17

would also increase delay and expense and create the risk of inconsistent or contradictory adjudications, whereas a class action presents no unusual management difficulties and provides the benefits of single-proceeding adjudication, economies of scale, and comprehensive supervision by a single court.

68.    The prosecution of separate actions against Aesto would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Aesto, and adjudications with respect to individual Class Members could, as a practical matter, be dispositive of the interests of other Class Members or substantially impair their ability to protect their interests.

**FIRST CAUSE OF ACTION**
**Negligence**
(On Behalf of Plaintiff and the Class)

69.    Plaintiff incorporates by reference paragraphs 1-68 as if fully set forth herein.

70.    Plaintiff and the Class entrusted their Private Information to Covered Entities that, in turn, entrusted it to Aesto, on the premise and with the understanding that Aesto would safeguard that information, use it for authorized purposes only, and not disclose it to unauthorized third parties.

71.    Aesto owed a duty of care to Plaintiff and Class Members to use reasonable care in handling and safeguarding their Private Information. This duty arose from: (a) Aesto's status as a custodian of highly sensitive Private Information; (b) the special relationship between Aesto and the individuals whose Private Information it held, arising from Aesto's voluntary assumption of responsibility for that sensitive and confidential personally identifiable information and protected health information; (c) Aesto's representations and promises regarding data security; (d) the requirements of Section 5 of the FTC Act, 15 U.S.C. § 45; (e) Aesto's obligations under HIPAA

18

and the HITECH Act as a business associate; and (f) industry standards including the CIS Controls and NIST Cybersecurity Framework.

72.     Aesto owed Plaintiff and Class Members at least the following duties: (a) to exercise reasonable care in handling and using the Private Information in its care and custody; (b) to implement industry-standard security procedures sufficient to reasonably protect Private Information from a data breach, theft, and unauthorized access; (c) to promptly detect attempts at unauthorized access; (d) to adopt security measures recommended by experts in the field; and (e) to notify Plaintiff and Class Members within a reasonable timeframe of any breach of the security of their Private Information.

73.     Aesto had full knowledge of the sensitivity of the Private Information it maintained and the types of harm that Plaintiff and the Class could and would suffer if that information were wrongfully disclosed. Aesto knew or should have known that the risk of unauthorized access was heightened because: (a) Aesto had already experienced a data breach in 2022; (b) the healthcare sector is a prime target for cyberattacks; (c) Aesto stored vast quantities of especially sensitive PHI and PII on networked systems; and (d) Aesto was aware of the well-documented risks of cyber intrusions targeting healthcare data.

74.     Aesto breached its duties by failing to implement and maintain adequate, industry-standard cybersecurity safeguards for its AWS environment and related systems; by failing to promptly detect the unauthorized access (which persisted for sixteen days before detection); by failing to remediate known vulnerabilities; and by failing to provide reasonably timely notice of the Data Breach to affected individuals.

75.     Aesto further breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers; by failing to comply with the FTC Act,

19

HIPAA, the HITECH Act, and applicable industry standards; and by failing to adequately train its employees on data security practices.

76. Aesto's negligence was the direct and proximate cause of the Data Breach and Plaintiff's and Class Members' resulting injuries. But for Aesto's failure to use adequate data security, Plaintiff's and Class Members' Private Information would not have been compromised.

77. As a direct and proximate result of Aesto's negligence, unauthorized actors gained access to systems containing Plaintiff's and Class Members' Private Information, and Plaintiff and Class Members have suffered and will continue to suffer damages, including the theft and improper disclosure of their Private Information, the lost value of their Private Information, lost time and money incurred to mitigate and remediate the effects of the Data Breach, an increased and imminent risk of future harm, and emotional distress.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
(On Behalf of Plaintiff and the Class)

78. Plaintiff incorporates by reference paragraphs 1-68 as if fully set forth herein.

79. Plaintiff and Class Members were the intended third-party beneficiaries of implied contracts between Aesto and its Covered Entity clients. Under those agreements, Aesto agreed to safeguard the Private Information of the Covered Entities' patients—i.e., Plaintiff and Class Members. Additionally, when Plaintiff and Class Members provided their Private Information to their Covered Entities, an implicit term of those relationships was that the Covered Entities would ensure that any business associate receiving the information would protect it adequately.

80. Plaintiff and Class Members reasonably understood that a portion of the consideration paid for healthcare services would be used to pay for adequate cybersecurity measures, and that Aesto, as the downstream custodian of their Private Information, would

20

implement adequate cybersecurity measures to protect that information. This understanding was based on Aesto's duties under federal and state law, its representations regarding data security, its Business Associate Agreements, and its Privacy Notice.

81.     Implicit in the contractual relationships was that Aesto would: (a) safeguard the Private Information of Plaintiff and Class Members against unauthorized access and disclosure; (b) not disclose the Private Information to unauthorized third parties; (c) comply with applicable laws and industry standards regarding data security; and (d) provide Plaintiff and Class Members with prompt and adequate notice of any unauthorized access to or theft of their Private Information.

82.     Plaintiff and Class Members would not have entrusted their Private Information to their Covered Entities—and thereby to Aesto—in the absence of such implied contracts, and they fully performed their obligations under the implied contracts.

83.     The covenant of good faith and fair dealing is an element of every contract, requiring the parties to act with honesty in fact and to preserve the spirit—not merely the letter—of the bargain.

84.     Aesto materially breached the implied contracts by: (a) failing to safeguard Plaintiff's and Class Members' Private Information; (b) failing to notify them promptly of the Data Breach; (c) failing to comply with industry standards for data security; (d) failing to comply with the legal obligations necessarily incorporated into its agreements with Covered Entities; and (e) failing to ensure the confidentiality, integrity, and availability of the Private Information it created, received, maintained, and transmitted.

85.     Aesto's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries as detailed herein, including the loss of the benefit of the bargain.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
(On Behalf of Plaintiff and the Class)
(Plead in the Alternative to Breach of Implied Contract)

86.    Plaintiff incorporates by reference paragraphs 1-68 as if fully set forth herein.

87.    This claim is pleaded in the alternative to the breach of implied contract claim.

88.    Plaintiff and Class Members conferred a benefit upon Aesto. Aesto received fees from its Covered Entity clients for providing data migration and archiving services, which fees were paid, in part, from the healthcare fees paid by Plaintiff and Class Members. Additionally, Plaintiff and Class Members conferred a benefit on Aesto by entrusting their Private Information to Aesto through their Covered Entities, which Private Information had independent economic value and enabled Aesto to conduct its business.

89.    Aesto appreciated and had knowledge of the benefits it received from Plaintiff and Class Members.

90.    Aesto enriched itself by saving the costs it reasonably should have expended on data-security measures sufficient to protect Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Aesto calculated to avoid its data-security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures.

91.    Under principles of equity and good conscience, Aesto should not be permitted to retain the full value of the benefits conferred upon it by Plaintiff and Class Members. Plaintiff and Class Members have no adequate remedy at law.

92.    Aesto should be compelled to disgorge, into a common fund for the benefit of Plaintiff and Class Members, all unlawful or inequitable proceeds it received as a result of its conduct, including the money saved by failing to invest in adequate data security.

22

**FOURTH CAUSE OF ACTION**
**Declaratory Judgment**
(On Behalf of Plaintiff and the Class)

93.     Plaintiff incorporates by reference paragraphs 1-68 as if fully set forth herein.

94.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief.

95.     In the fallout of the Data Breach, an actual controversy has arisen and now exists concerning Aesto's duties to use reasonable data security to protect Private Information. Plaintiff alleges that Aesto's data-security practices were—and still are—inadequate and unreasonable, and that Plaintiff and Class Members continue to suffer ongoing injury from the continuing threat of fraud, identity theft, and unauthorized disclosure.

96.     This Court should enter a judgment declaring, among other things, that: (a) Aesto owed—and continues to owe—a legal duty to use reasonable data security to secure the Private Information entrusted to it; (b) Aesto breached, and continues to breach, its duties by failing to use reasonable measures to protect the Private Information entrusted to it; (c) Aesto's breach of its duties caused—and continues to cause—injury to Plaintiff and Class Members; and (d) Aesto must adopt and implement commercially reasonable data-security measures sufficient to protect Private Information from further unauthorized access.

97.     The Court should also issue corresponding injunctive relief requiring Aesto to use adequate security consistent with industry standards to protect the Private Information entrusted to it, including by requiring Aesto to: (a) engage independent third-party security auditors and penetration testers to conduct periodic audits of Aesto's systems; (b) implement multi-factor authentication for all access to systems containing Private Information and encrypt all sensitive

23

data at rest and in transit; (c) segment applications handling Private Information and conduct regular database scans to identify and remediate vulnerabilities; (d) provide ongoing, mandatory cybersecurity training and education to all employees with access to Private Information; (e) purge, delete, or destroy Private Information not necessary for any legitimate, ongoing business purpose; and (f) provide adequate credit monitoring and identity-theft protection services to all Class Members.

98.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy, because many of the resulting injuries are not readily quantified in full and the hardship to Plaintiff and Class Members far exceeds any minimal hardship to Aesto. An injunction would benefit the public by preventing another data breach and further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members respectfully request that the Court enter an order and judgment against Defendant as follows:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel as Class Counsel;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class, including requiring Aesto to implement and maintain commercially reasonable data-security measures;

D. Awarding Plaintiff and the Class compensatory, statutory, exemplary, and punitive damages, as allowed by law, in an amount to be proven at trial;

E. Awarding restitution to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs of litigation, as allowed by law;

G. Awarding the maximum prejudgment and post-judgment interest allowed by law;

H. Granting Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial; and

I. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and Class Members demand a trial by jury of all claims and issues so triable as of right.

Dated: July 29, 2026                    Respectfully submitted,

/s/ *Jonathan S. Mann*
Jonathan S. Mann (ASB-1083-A36M)
Austin B. Whitten (ASB-K13Y-7228)
**PITTMAN, DUTTON, HELLUMS,**
**BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Email: jonm@pittmandutton.com
Email: austinw@pittmandutton.com

*Attorneys for Plaintiff and the Proposed Class*

25